1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUSTIN EVERS, as an individual and on behalf of all others similarly situated,<br><br>                                                  Plaintiff,<br><br>v.<br><br>LA-Z-BOY INCORPORATED, a Michigan corporation; LZB RETAIL, INC., a Michigan corporation; and DOES 1 through 50, inclusive,<br><br>                                                  Defendants. | Case No.:  21cv2100-LL-BLM<br><br>**ORDER (1) GRANTING PLAINTIFF'S MOTION TO REMAND; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' EX PARTE APPLICATION**<br><br>**[ECF Nos. 9, 16]** |

11
12
13
14
15
16
17
18
19
20

        This matter is before the Court on: (1) Plaintiff Dustin Evers's ("Plaintiff") Motion to Remand; and (2) Defendants' Ex Parte Motion for an Order (1) Construing Defendants' Opposition to Motion to Remand as an Amendment to Notice of Removal or Granting Leave to File an Amended Notice; and (2) Striking and/or Disregarding Plaintiff's Arguments Raised for the First Time on Reply; and/or (3) Granting Defendants Leave to File a Sur-Reply. ECF Nos. 9, 16. As explained below, the Court **GRANTS IN PART** Defendants' Ex Parte Application Construing Defendants' Opposition to Motion to Remand as an Amendment to the Notice of Removal, **DENIES IN PART** Defendants' Ex

21
22
23
24
25
26
27
28

Parte Application Striking and/or Disregarding Plaintiff's Arguments Raised for the First Time on Reply, and **DENIES IN PART AS MOOT** Defendants' Ex Parte Application Granting Defendants Leave to File a Sur-Reply. Additionally, the Court **GRANTS** Plaintiff's Motion to Remand and **REMANDS** this matter to San Diego County Superior Court for lack of subject matter jurisdiction.

## I.    BACKGROUND

On November 12, 2021, Plaintiff filed a putative class action in the San Diego County Superior Court against Defendant La-Z-Boy Incorporated and Specially Appearing Defendant LZB Retail, Inc. ("Defendants"). ECF No. 1-2, Ex. A ("Complaint"). In the Complaint, Plaintiff sought to certify one putative class and seven different subclasses of Defendants' current and former employees. *Id.* at ¶¶ 37–38. Plaintiff alleged nine separate causes of action against Defendants for: (1) failure to pay all minimum wages; (2) failure to pay all overtime wages; (3) meal period violations; (4) rest period violation; (5) untimely payment of wages; (6) wage statement violations; (7) waiting time penalties; (8) failure to reimburse business expenses; and (9) violations of California's Unfair Competition Law. *Id.* at ¶¶ 47–78.

On December 17, 2021, Defendants removed the action to federal court. ECF No. 1. Defendants' Notice of Removal ("NOR") stated that Defendants were removing the case pursuant to 28 U.S.C. § 1441, the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), and 28 U.S.C. § 1446. *Id.* at 4. Defendants assert that the case satisfied CAFA's jurisdictional requirements because the: "(1) proposed class contains more than 100 members; (2) Defendants are not a state, state official, or other governmental entity; (3) the total amount in controversy for all class members exceeds $5,000,000; and (4) there is diversity of citizenship between at least one class member and at least one of the Defendants." *Id.* at 4–5.

On January 18, 2022, Plaintiff filed the instant Motion to Remand ("Motion"). ECF No. 9. On February 8, 2022, Defendants filed their Opposition ("Opposition" or

"Oppo.") to Plaintiff's Motion.[1] ECF No. 13. On February 15, 2022, Plaintiff filed his Reply ("Reply") in support of his Motion. ECF No. 15.

On February 22, 2022, Defendants filed an ex parte application for an Order (1) Construing Defendants' Opposition to Motion to Remand as an Amendment to Notice of Removal or Granting Leave to File an Amended Notice; and (2) Striking and/or Disregarding Plaintiff's Arguments Raised for the First Time on Reply; and/or (3) Granting Defendants Leave to File a Sur-Reply. ECF No. 16. On February 24, 2022, Plaintiff filed an opposition to Defendants' ex parte application. ECF No. 17.

Further, on March 18, 2022, Defendants filed a Notice of New Precedential Authority in support of their Opposition to the Motion.[2] ECF No. 18. Plaintiff filed an opposition on the same day. ECF No. 19.

/ / /

---

[1] Defendants request that the Court take judicial notice of Defendants' Statements of Information from the Secretary of State of the State of California's website. ECF No. 13-1, Exhibits C–D. The Court **GRANTS IN PART** Defendants' request for judicial notice as to Exhibits C and D because they are public records and government documents found on reliable sources on the internet, and neither party disputes the authenticity of the websites or the accuracy of the information. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). The Court **DENIES IN PART** Defendants' request for judicial notice as to the remaining exhibits, Exhibits A and B, because they were not used in this analysis. In addition, the Court declines to address Defendants' evidentiary objections, most of which are directed at the lack of foundation. These objections need not be addressed here, as most of the evidence could be presented in admissible form at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). Therefore, the evidentiary objections (ECF No. 13-4) are **DENIED**.

[2] Defendants' Notice of New Authority cites to *Jauregui v. Roadrunner Transportation Services, Inc.*, 28 F.4th 989 (9th Cir. 2022). ECF No. 18. While the parties disagree about the impact of *Jauregui*, the Court will consider this supplemental authority because: (1) the law is on point with the instant case, and (2) the Ninth Circuit opinion was filed on March 17, 2022, *after* Defendants had filed their Opposition and *after* Plaintiff had filed his Reply. The Court will accordingly evaluate Plaintiff's Motion with the impact of the Ninth Circuit decision.

## II.     LEGAL STANDARD

### A.     Class Action Fairness Act ("CAFA") Diversity Jurisdiction

Removal is proper where federal courts have original jurisdiction over an action brought in state court. 28 U.S.C. § 1441(a). Pursuant to CAFA, federal courts have original jurisdiction over state law actions in which: (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (2) the number of members of all proposed plaintiff classes in the aggregate is more than 100; and (3) where any member of a class of plaintiffs is a citizen of a State different from any defendant. 28 U.S.C. § 1332(d). Typically, courts strictly construe the removal statute against removal jurisdiction. *See, e.g., Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1087 (9th Cir. 2009); *Luther v. Countrywide Home Loans Servicing, LP*, 533 F.3d 1031, 1034 (9th Cir. 2008). However, "'no antiremoval presumption attends cases invoking CAFA,' in part because the statute was enacted 'to facilitate adjudication of certain class actions in federal court.'" *Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 992–93 (9th Cir. 2022) (quoting *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014)).

The Ninth Circuit has set forth "three principles that apply in CAFA removal cases." *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019). In seeking removal under CAFA, the removing party bears the burden of establishing federal jurisdiction. *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015). First, a defendant seeking to remove a case under CAFA need only include in the notice of removal a "plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart*, 574 U.S. at 89. Second, when "a plaintiff contests the amount in controversy allegation, 'both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied.'" *Jauregui*, 28 F.4th at 992 (quoting *Dart*, 574 U.S. at 88). "[T]he removing party must be able to rely 'on a chain of reasoning that includes assumptions to satisfy its burden to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million,' as long as the reasoning and underlying assumptions are reasonable." *Id.* at 993 (quoting

4

1  *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1201 (9th Cir. 2015)). Assumptions must

2  have "some reasonable ground underlying them," and "may be reasonable if [they are]

3  founded on the allegations of the complaint." *Arias*, 936 F.3d at 925 (citations and internal

4  quotation marks omitted). "Third, when a statute or contract provides for the recovery of

5  attorneys' fees, prospective attorneys' fees must be included in the assessment of the

6  amount in controversy." *Id.* (citing *Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d

7  785, 794 (9th Cir. 2018).

8  **B.   "Facial" and "Factual" Challenges to the Amount in Controversy**

9  After a removing defendant alleges the amount in controversy requirement is met,

10  "the plaintiff can contest the amount in controversy by making either a 'facial' or a 'factual'

11  attack on the defendant's jurisdictional allegations." *Harris v. KM Indus., Inc.*, 980 F.3d

12  694, 699 (9th Cir. 2020) ("*Harris*") (citing *Salter v. Quality Carriers, Inc.*, 974 F.3d 959,

13  964 (9th Cir. 2020)). "A 'facial' attack accepts the truth of the [defendant's] allegations but

14  asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Salter*, 974

15  F.3d at 964 (9th Cir. 2020) (quoting *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir.

16  2014)). In evaluating a facial attack, "the court, accepting the allegations as true and

17  drawing all reasonable inferences in the defendant's favor, 'determines whether the

18  allegations are sufficient as a legal matter to invoke the court's jurisdiction.'" *Id.* (quoting

19  *Leite*, 749 F.3d at 1121).

20  In contrast, "[a] factual attack 'contests the truth of the ... allegations' themselves.

21  *Harris*, 980 F.3d at 699 (alteration in original). Here, "the burden is on the defendant to

22  show, by a preponderance of the evidence, that the amount in controversy exceeds the $5

23  million jurisdictional threshold." *Id.* (citing *Ibarra*, 775 F.3d at 1197). "Both parties may

24  submit evidence supporting the amount in controversy before the district court rules." *Id.*

25  (citations omitted).

26  / / /

27  / / /

28  / / /

## III.   DISCUSSION

### A.   CAFA Jurisdiction and the Amount in Controversy

At issue in this Motion is whether this Court has removal jurisdiction pursuant to CAFA. The parties do not dispute that minimal diversity exists. Plaintiff challenges Defendants' showing of CAFA's $5 million amount in controversy requirement. In Defendants' NOR, Defendants allege that the total amount in controversy is $5,122,868.84. NOR ¶ 64. In their Opposition, Defendants say that even with much lower assumed violation rates, the CAFA amount in controversy is still $5,021,668.78. Oppo. at 24. Defendants subsequently filed an ex parte application for an order construing their Opposition as a timely amendment to their NOR because they claim the removal period was never triggered. ECF No. 16. Plaintiff argues, however, that Defendants' Opposition amending their amounts in controversy was untimely. ECF No. 17 at 5. Plaintiff also disputes each category of calculations underlying these alleged amounts in controversy. The Court evaluates each category in turn, but first confronts Defendants' ex parte application regarding the timeliness of Defendants' amendment of their NOR.

### 1.   Defendants' Ex Parte Application and Amendment of the AICs

Defendants argue that in a CAFA action they are permitted to amend the NOR's amount in controversy estimates.[3] ECF No. 16-1 at 13–14. Defendants' total amount in controversy in their Opposition, $5,021,669.78, is different than the figure Defendants

---

[3] Defendants also argue in the ex parte that they were "entitled to freely amend their NOR via their Opposition" because the thirty-day period for removal was never triggered under 28 U.S.C. § 1446. ECF No. 16-1 at 11. Defendants, however, misapply Section 1446(b) because Defendants had already removed the case. The specific cases and circumstances that Defendants rely on specifically concern whether amendment *during* that thirty-day period of removal, and not whether amendment *after* a notice of removal is filed, is timely. *See* ECF No. 16-1 at 11–12; ECF No. 16-1 at 11 ("[T]here is no dispute that Defendants' NOR was timely filed."); *see also Rea v. Michaels Stores Inc.*, 742 F.3d 1234, 1238 (9th Cir. 2014) (whether the initial thirty-day removal period was triggered is related to timeliness of removal).

initially offered as the amount in controversy in their NOR of $5,122,868.84. Plaintiff does not oppose the lower figure, but opposes the "new damage models" used in coming to this figure. *See* ECF No. 17 at 3. In opposition to Defendants' amendments, Plaintiff contends Defendants' NOR "deliberately omit[ted] substantive allegations, assumptions, calculations, and estimates, that were then added in the Opposition." ECF No. 15 at 9. Ultimately, Plaintiff argues Defendants' NOR is effectively a "sur-reply" and an untimely attempt to amend their NOR. *See* ECF No. 15 at 3; ECF No. 17 at 5.

The Ninth Circuit has made clear "the removal petition cannot be thereafter amended to add allegations of substance but solely to clarify 'defective' allegations of jurisdiction previously made." *Barrow Development Co. v. Fulton Ins. Co.*, 418 F.2d 316, 317 (9th Cir. 1969). In support of this, Plaintiff cites to cases in which the court refused to permit amendment when the defendant sought to add completely new grounds not stated in the original notice of removal. ECF No. 17 at 5; *see Prado v. Dart Container Corp. of Cal.*, 373 F.Supp.3d 1281, 1287 (N.D. Cal. 2019); *Ortiz v. Tara Materials, Inc.*, 2021 WL 5982289 (S.D. Cal. Dec. 17, 2021) (finding defendant could not assert a new, entirely different basis for removal from that originally alleged). In *Prado*, the defendant sought to amend its notice of removal "to rely on an entirely different timeliness ground not stated in the original notice of removal." *Prado*, 373 F.Supp.3d at 1288. In *Ortiz*, the defendant sought leave to amend the notice of removal to add a completely new substantive basis for removal in which "Plaintiff's claims alone are sufficient to satisfy the amount-in-controversy requirement." *Ortiz*, 2021 WL 5982289 at *3. *Barrow* and *Ortiz*, however, are distinguishable from the facts here.

Here, Defendants' NOR was only required to "contain[ ] a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). Only after removal was challenged by the Plaintiff did Defendants "submit proof" supporting their positions as to the amount in controversy. *Dart*, 574 U.S. at 88; *see also Jauregui*, 28 F.4th at 991–92 (once removal was challenged, defendant submitted "summary judgment style evidence" to establish the amount in controversy); *Arias*, 936 F.3d at 925 ("evidence showing the

amount in controversy is required 'only when the plaintiff contests, or the court questions, the defendant's allegation.'"). The calculations and models used in Defendants' Opposition therefore clarified how Defendants came to their CAFA amount in controversy estimates. *But see Prado*, 373 F.Supp.3d at 1288; *Ortiz*, 2021 WL 5982289 at *3. As such, the Opposition's estimates were the result of Defendants appropriately responding to the new standards and new methods for supporting their claims at a later point in this litigation. Accordingly, the Court will consider the calculations contained in Defendants' Opposition.

### 2. CAFA Amount in Controversy

The core dispute here is whether Defendants have sufficiently supported the assumptions underlying their amount in controversy calculations. Plaintiff argues that Defendants have failed to show that the total amount in controversy exceeds $5 million as required by 28 U.S.C. §§ 1332(d), 1447. Motion at 1. The Court first notes that Plaintiff mounts a factual attack in its Motion because Plaintiff "challenge[d] the truth of [Defendants'] jurisdictional allegations by making a reasoned argument as to why any assumptions on which they are based are not supported by evidence." *Harris*, 980 F.3d at 700 (citing *Salter*, 974 F.3d at 964). Defendants also appear to have treated the attack as factual, given the "Declaration of Laura Williams in Support of Defendants' Opposition" supports the Defendants' assumptions in their NOR. *Id.* at 701 (noting submission of a declaration supporting a defendant's notice of removal following a plaintiff's motion to remand); *see also* ECF No. 13-3. Thus, Defendants' calculations and assumptions are supported by the declaration in which Williams says she "reviewed personnel, payroll, timekeeping, and wage records for Plaintiff" and the other punitive class members. ECF No. 13-3 ¶¶ 6–8. With a factual attack, Defendants have the burden to support their "jurisdictional allegations with competent proof" and establish that this case meets CAFA's jurisdictional minimum "by a preponderance of the evidence." *Harris*, 980 F.3d at 701 (citing *Salter*, 974 F.3d at 964); *see also Jauregui*, 28 F.4th at 994.

Still, the Ninth Circuit in *Harris* cautioned that "the preponderance standard does not require a district court to perform a detailed mathematical calculation of the amount in

controversy before determining whether the defendant has satisfied its burden" and the court "should weigh the reasonableness of the removing party's assumptions, not supply further assumptions of its own." *Id.* at 701. To that end, the Court will "consider[ ] any evidence put forth by the parties, and assess[ ] the reasonableness of the defendant's assumptions ..., 'then decide[ ] where the preponderance lies.'" *Id.* at 701 (quoting *Ibarra*, 775 F.3d at 1198); *but see Jauregui*, 28 F.4th at 994 (holding court erred by "assigning $0 to five out of seven of [p]laintiff's claims" where defendant "offered substantial evidence and identified assumptions to support its valuation of each of the various claims" but "the court disagreed with some of [defendant's] assumptions"). Following this directive, the Court eliminates assumptions that are self-evidently unreasonable or baseless. *Jauregui*, 28 F.4th at 996; *see also Ibarra*, 775 F.3d at 1199 ("[A]ssumptions cannot be pulled from thin air but need some reasonable ground underlying them."). Where alternative assumptions have been offered, the court adopts the best reasonable alternative. *Jauregui*, 28 F.4th at 996. The Court sets forth its application of this approach to Defendants' asserted violation assumptions and rates to each of Plaintiff's claims below.

### a.   Overtime and Regular Wages

Plaintiff's first and second claims are for failure to pay minimum and overtime wages under California Labor Code §§ 510, 1194, and 1194.2. Complaint ¶¶ 47–52. Defendants contend that the amount placed in controversy for sub-minimum wages in regard to unpaid regular wages is $91,197.04. Oppo. at 8. This figure takes the "[t]otal base hourly wages that allegedly should have been paid for all non-overtime hours not paid at the applicable statutory minimum wage rate," and reduces it by the "[t]otal base hourly wages allegedly paid for non-OT hours at sub-minimum wage rates." *Id.* at 7. These calculations are based on an average minimum wage per hour of $12.00 in 2019; $13.00 in 2020; and $14.00 in 2021. *Id.* at 8. In support of the average minimum wage used in their calculations, Defendants cite to the State of California's minimum wage ordinances and to the assumptions provided in the Declaration of Laura Williams that "no PCMs ["putative class members"] were paid a base hourly wage below the applicable minimum wage rate

in 2017 and 2018." Oppo. At 8; ECF No. 13-3 ¶ 11. Plaintiff does not object to this claim. As such, the court adopts this estimate. *See Dart*, 574 U.S. at 82 ("the amount-in-controversy allegation of a defendant seeking federal-court adjudication should be accepted when not contested by the plaintiff.")

Next, Defendants allege that $131,395.95 is in controversy from off-the-clock minimum wage violations. Oppo. at 9. Defendants' calculations are based on the difference between 50,790 shifts over five hours and 15,440 recorded late, short, or missed break shifts. *Id.* Defendants then multiplied this number of recorded timely thirty-minute break shifts with a violation rate of 60% by a weighted average minimum wage rate of $12.39, and by the number of off-the-clock hours. *Id.* In the Opposition, Defendants assume a 60% violation rate instead of a 100% violation rate for unpaid thirty-minute meal breaks for each shift worked by the PCMs. In support of this 60% violation rate, Defendants point to language in the Complaint alleging "common" "policy and practice." Complaint ¶ 20.

The violation rate inquiry is fact-specific; the Ninth Circuit allows a 100% violation rate to be assumed in some cases but has found the assumption unwarranted in other cases. *See Ibarra*, 775 F.3d at 1198–1200 ("a 'pattern and practice' of doing something does not necessarily mean *always* doing something."). District courts in this circuit have found violation rates ranging from 25% to 60% can be reasonably assumed as a matter of law based on 'pattern and practice' or 'policy and practice' allegation. *See Avila v. Rue21, Inc.*, 432 F. Supp. 3d 1175,1189 (E.D. Cal. 2020) (quoting *Olson v. Becton, Dickinson & Co.,* 2019 WL 4673329, at *4 (S.D. Cal. Sept. 25, 2019) (finding 25% violation rate to be appropriate based on the plaintiff's "pattern and practice" allegation)); *Alvarez v. Office Depot, Inc.*, 2017 WL 5952181, at *3 (C.D. Cal. Nov. 30, 2017) (using 60% violation rate); *Oda v. Gucci Am., Inc.*, 2015 WL 93335, at *4 (C.D. Cal. Jan. 7, 2015) (using 50% violation rate). Where allegations instead allege systematic, regular, or consistent violations, it is reasonable to assume one violation per week, or a 20% violation rate. *Sanchez v. Capital Contractors*, 2014 WL 4773961, at *3 (N.D. Cal. Sept. 22, 2014).

In this case, Defendants' initial assumption of a 100% violation rate is not "reasonable." While Plaintiff alleges in his Complaint that Defendants engaged in a "pattern and practice," engaging in a "pattern or practice" does not mean that a violation occurred in 100% of shifts. *See* Complaint ¶ 20; *Ibarra*, 775 F.3d at 1198–99 (finding that a "'pattern and practice' of doing something does not necessarily mean always doing something"). Because the Court rejects the 100% violation rate from Defendants' NOR, it must look for a reasonable "alternative assumption" as a basis for recalculation. *Jauregui*, 28 F.4th at 994. Defendants provide a reasonable alternative assumption with a 60% violation rate. *See Ibarra*, 775 F.3d at 1198–1200; *Alvarez*, 2017 WL 5952181, at *3 (using 60% violation rate). Although this violation rate is on the higher end of the violation rates, the Court will assume a 60% violation rate for off-the-clock minimum wage violations. Additionally, it has not been challenged by Plaintiff. *See Dart*, 574 U.S. at 82. Accordingly, the Court will adopt the off-the-clock minimum wage violation amount in controversy from Defendants' Opposition.

Lastly, Defendants contend the amount placed in controversy for Plaintiff's claim for unpaid overtime wages is $91,884.37. Oppo. at 10. Defendants' calculation is based on the difference between total overtime wages that would have been paid for overtime hours worked using the average regular rate of pay (RROP) during the four-year statute of limitations period, and the total base hourly overtime wages allegedly paid for overtime hours worked. *Id.* These calculations are based on 9,075 overtime hours, $20.20 as the RROP, and an average base rate of $13.45. *Id.*

Similar to the sub-minimum wage calculation in which Defendants provided a reasonable calculation of unpaid overtime wages, here, Defendants provided a calculation based on reasonable assumptions. Plaintiff does not object to the average minimum wage and RROP, and additionally provides no challenge to the damage calculations for unpaid overtime wages. Accordingly, the Court finds that Defendants' revised calculation of the amount in controversy is reasonable and adopts Defendants' amount in controversy for unpaid overtime wages.

### b.   Liquidated Damages

Defendants also provide calculations for the amount in controversy for Plaintiff's claim for liquidated damages "in an amount equal to the wages unlawfully paid" pursuant to California Labor Code § 1194.2. NOR ¶ 37. As stated above, Plaintiff does not object to these average minimum wages, and Plaintiff does not challenge Defendants' calculation of liquidated damages. *See Dart*, 574 U.S. at 82. Additionally, the courts have approved the use of the average minimum wage during the relevant putative class period to estimate liquidated damages. *See* Cal. Lab. Code § 1194.2(a); *Rapisura v. BMW of North America, LLC*, 2022 WL 1557001, at *3 (E.D. Cal. May 17, 2022) (allowing recovery of liquidated damages in an amount equal to unpaid minimum wages); *see also Cabrera v. South Valley Almond Company, LLC*, 2021 WL 5937585, at *8 (E.D. Cal. Dec. 16, 2021). Accordingly, the Court finds that Defendants' calculation of the amount in controversy for liquidated damages of $222,592.99, based on the same minimum wage ordinances and the 60% violation rate adopted above for overtime and minimum wages, is reasonable.

### c.   Meal and Rest Period Violations

Plaintiff also contends Defendants did not provide members of the putative class with required meal and rest periods in violation of California Labor Code §§ 226.7 and 512. Complaint ¶¶ 53–60. Defendants argue that $311,888.00 is in controversy for these facial meal break violations. Oppo. at 11. Defendants assume Plaintiff seeks a missed meal period for each workday of over five hours, and that Plaintiff and the PCM's time records reflect an actual violation of a late, short, or missed meal break. *Id.* Defendants then calculated there were 15,440 late, short, or missed meal breaks. According to the Declaration of Laura Williams, this number was based on figures reflected in Defendants' actual time records and timekeeping data. ECF No. 13-3 ¶ 12(c), (x). Defendants then multiplied this number with an RROP of $20.20. Similar to the adopted amounts above, Plaintiff does not object to this RROP calculation and the facial meal period violations. *See Dart*, 574 U.S. at 82. Thus, the Court finds that Defendants have sufficiently placed $311,880.00 in controversy for their claim regarding facial meal break violations.

12

Next, Defendants argue that the amount in controversy for latent meal break violations is $428,442.00. Defendants assume a 100% violation rate in their Opposition, but also offer an alternative assumption of a 60% violation rate. Defendants allege a 100% violation rate can be found in Plaintiff's Complaint, which alleges such violations resulted from common policy and practice. Complaint ¶¶ 22, 24.

To calculate an amount in controversy for latent meal break violations, Defendants take the difference of all recorded shifts and each recorded late, short, or missed break shift for each workday over five hours. Oppo. at 13. Defendant then multiplied this number with a 60% violation rate and a $20.20 RROP. *Id.* Plaintiff objects to this calculation, stating that "Defendants' assumption of a 100 percent rate is entirely speculative from the face of the Complaint and Defendants have offered zero evidence of why their assumption is reasonable." Motion at 14.

The Court agrees with the Plaintiff that assuming a 100%, or even a 60%, violation rate is not appropriate. While the Complaint alleges that Defendants engaged in a "pattern and practice" of not providing or scheduling meal breaks, engaging in a "pattern or practice" does not mean that a violation occurred in a 100% of shifts. *See* Complaint ¶¶ 22, 24; *Ibarra*, 775 F.3d at 1198–99 (a "'pattern and practice' of doing something does not necessarily mean always doing something"). *See also Nunes v. Home Depot U.S.A., Inc.*, 2019 WL 4316903, at *2 (E.D. Cal. 2019) (20% violation rate was reasonable where complaint alleged defendants caused class members to forfeit meal breaks without compensation "from time-to-time"). Further, other district courts routinely assume a 20% violation rate for meal and rest break claims where no evidence as to the frequency of violations is presented. *See Bryant v. NCR Corp.*, 284 F. Supp. 3d 1147, 1151 (S.D. Cal. 2018) (using a 60% violation rate for the meal period claim and a 30% violation rate for rest period claim); *Elizarraz v. United Rentals, Inc.*, 2019 WL 1553664, at *3–4 (C.D. Cal. Apr. 9, 2019) (using a 50% violation rate for meal period claim and a 30% violation rate for rest period claim); *Mendoza v. Savage Servs. Corp.*, 2019 WL 1260629, at *2 (C.D. Cal. Mar. 19, 2019) ("When a defendant's calculation lacks factual support, courts in this

district routinely apply a 20% violation rate—that is, one missed meal and rest period per work week—for meal and rest period premiums.").

In support of utilizing a 60% or 100% violation rate, Defendants may argue they are not "required to comb through [their] records to identify and calculate the exact frequency of violations." *Ritenour v. Carrington Mortgage Services LLC*, 228 F.Supp.3d 1025, 1029 (C.D. Cal. 2017). While it is true that Plaintiff's allegations of meal period violations are extensive and Defendants are indeed not required to "comb through [their] records," *Ritenour* was distinguishable from the facts here. *Id.* In *Ritenour*, the plaintiff's vague and broad complaint provided "little, if any, help in identifying the alleged violations," such that a defendant was justified in using reasonable estimates. *Id.* Here, however, Plaintiff's Complaint provided enough details such that Defendants were able to produce multiple detailed pages of calculations regarding the alleged amount in controversy. *See* Oppo.; ECF No. 13 Exs. 1–3; ECF No. 13-3. Accordingly, a 60% or 100% violation rate should not be applied to the recorded complaint meal breaks. Additionally, unlike the facial meal break violations, Defendants have not provided any evidence supporting their contention for assuming a 60% violation rate. As such, Defendants' assumption is not reasonable, and the Court finds it highly unlikely that every late, short, or missed meal period was recorded. While the Court will not zero out the claim, the Court will instead assume a 20% violation rate used by Plaintiff and the other district courts in violation rates for meal break violations. *See Jauregui*, 28 F.4th at 992. This results in an amount in controversy of $142,814.00.

> i.    **Latent Meal Break Violation**: (**50,790** shifts over 5 hours – **15,440** recorded late/shorts/missed meal break shifts) x **$20.20** RROP x **.20** = **$142,814.00**

Defendants also contend that the amount in controversy for Plaintiff's fourth cause of action for rest period violations is predicated on the first rest break violations and second rest break violations. Oppo. at 13. Defendants allege $82,706.88 is in controversy for first rest break violations. *Id.* at 14. Defendants assume a 60% violation rate, i.e., a 60%

violation rate is applied to non-compliant rest periods for each day PCMs worked from three and a half to six hours. Regarding the second rest break violations, Defendants allege $948,794.00 is in controversy. *Id.* at 15. Defendants assume a 100% violation rate here, because Defendants allege the Complaint states the PCMs were "never authorized and permitted to take a second rest break when they worked a shift over six hours. *Id.* at 14 (emphasis removed). Defendants calculate the rest break violations in the same manner as the meal break violations, or by multiplying the number of shifts affected by each category to a $20.20 RROP and to a violation rate. *Id.* at 14–15. Plaintiff makes the same objections to these rest break calculations as he does to meal break violation calculations.

The Court's analysis, and the parties' arguments, are similar to those discussed above in relation to Plaintiff's claim for failure to provide meal periods. The difference here is that Plaintiff alleges that "Defendants willfully failed in their affirmative obligation to *consistently* authorize and permit" Plaintiff and the PCMs "to receive complaint, duty-free rest periods of not less than ten (10) minutes for every four hours worked" and also failed to "*consistently* pay" Plaintiff and the PCMs "one additional hour of pay at the respective regular rate of compensation for each workday that a fully complaint rest period was not provided." Complaint ¶¶ 58, 59 (emphasis added). Accordingly, while Plaintiff's allegations do not support a 100% violation rate, they do support a reasonable assumption rate of 60%. *See Alvarez v. Office Depot, Inc.*, 2017 WL 5952181, at *3 (C.D. Cal. Nov. 30, 2017) (finding 60% violation rate reasonable where the complaint "alleges a uniform practice of meal and rest period violations.").

Thus, the Court adopts Defendants' calculation regarding the first rest break violations of $82,706.88, but finds that an adjustment to the calculation of the second rest break violations is warranted to find the amount in controversy is $569,276.40.

        **ii.**    <u>**Second Rest Break Violations**</u>: **46,970** shifts over 6 hours x **$20.20** RROP x **.60** = <u>**$569,276.40**</u>

/ / /

/ / /

#### d. Untimely Payment of Wages

Plaintiff's fifth claim is for untimely payment of wages under Cal. Labor Code §§ 204, 204b, and 210. Complaint ¶¶ 61–63. Defendants allege that $576,208.40 is in controversy from these violations. In this claim, Plaintiff seeks penalties under Labor Code section 210 for "a statutory penalty in the amount of $100 for the initial violation for each failure to pay each employee and $200 for all subsequent violations . . . plus 25 percent of the amount unlawfully withheld." *Id.* at ¶ 63.

The Court finds that Defendants' calculation is reasonable, and Plaintiff does not object to this calculation. As such, the court adopts this estimate for untimely wage payment violations.[4] *See Dart*, 574 U.S. at 82.

#### e. Wage Statement Violations

Plaintiff further seeks statutory penalties for failure to provide accurate itemized wage statements in violation of Cal. Lab. Code § 226. Complaint ¶¶ 64–68. The statute proscribes damages of the greater of (1) actual damages, or (2) $50 for the initial pay period and $100 for each subsequent pay period in which a violation occurs, up to an aggregate penalty of $4,000. Cal. Lab. Code § 226(e). In Defendants' NOR, Defendants simply multiplied the total number of PCMs with the maximum statutory cap of $4,000 to reach a calculation of $636,000.00. *See* Motion at 15; NOR at 22. In the Motion, Plaintiff argues against a 100% violation rate and Defendants' calculation, because while the Complaint suggests that the wage statements fail to correctly list gross wages earned each pay period and total hours worked each pay period, the maximum statutory cap would not be

---

[4] The $576,208.40 amount in controversy provided by Defendants in their Opposition is actually higher than the amount that should be adopted by this Court because the latent meal break violations and second rest break violations amounts need to be adjusted to reflect the adoption of lower violation rates. The adjustments made by the Court affect the Defendants' 25% withheld total of $196,308.40. However, since the total amount in controversy is lower than $5 million even without the adjustments to the 25% withheld total, the Defendants' calculation will be used for ease in calculating the amount in controversy totals.

applicable to each class member. Motion at 11. In Defendants' Opposition, Defendants assume a 100% violation rate, claiming that the allegations of the Complaint suggest "each and every issued wage statement" of every PCMs was deficient. Oppo. at 17. However, Defendants' calculations result in an amount in controversy of $201,650.00 because instead of using the maximum statutory cap of $4,000 for each PCM again, Defendants multiply the corresponding penalty rate for each initial ($50) and subsequent ($100) wage statement. *Id.* at 18.

The Court finds Defendants' calculations in the Opposition totaling $201,650.00 sufficiently reasonable and finds they also mirror how Plaintiff came to his own calculation of $176,150. Plaintiff's allegation with respect to this claim also include gross wages earned and total hours actually worked "each pay period." Complaint ¶ 67. The Court finds it reasonable for Defendant to assume, in light of these allegations and the Court's findings above, and absence of any evidence to the contrary, that the pay periods in which a rest or meal break violation occurred and any other independent inaccuracy of the wage statements resulted in the inaccurate recording of initial and subsequent wage statements. *See Cabrera*, 2021 WL 5937585 at *10 (because the court assumed "one overtime violation, one minimum wage violation, one meal break violation and one rest period violation per week for each putative class member [,i]t follows that each of the bi-weekly wage statements Defendants issued to putative class members during the period in question contained an error of some sort"); *Nunes*, 2019 WL 4316903, at *3 ("Given the allegations, it is reasonable to assume the terminated class members suffered at least one violation (e.g., one missed meal or rest break) and were therefore not paid all wages owed upon termination."). Thus, the Court adopts Defendants' estimate, resulting in an amount-in-controversy for this claim of $201,650.00 for the 171 employees' initial wage statements and 1,931 subsequent wage statements at issue.

### f.      Waiting Time Penalties

Next, Plaintiff makes a claim for waiting time penalties under Cal. Lab. Code §§ 201–203. Complaint ¶¶ 69–71. In this claim, Plaintiff seeks penalties under California

Labor Code section 201–203 for Defendants' alleged failure to pay all wages owed to terminated employees at the time of separation. Cal. Lab. Code § 203. The penalty is up to thirty days' wages. *Id.* Defendants assume that all 171 of the separate PCMs during the statute of limitations period would be entitled to thirty days' pay of around seven hours a day – with a 100% violation rate. Oppo. at 18; *see also* NOR ¶¶ 56–57.

The courts have previously found reasonable a 100% assumed violation rate for waiting time penalties where the complaint at issue contained no guidance on the extent of the violations the plaintiff was alleging. *See Trigueros v. Stanford Fed. Credit Union*, 2021 WL 2649241, at *5–6 (N.D. Cal. June 28, 2021) (citing *Kastler v. Oh My Green, Inc.*, 2019 WL 5536198, at *6 (N.D. Cal. Oct. 25, 2019)); *accord Ford v. CEC Ent., Inc.*, 2014 WL 337790, at *3 (N.D. Cal. Jul. 10, 2014) (100% violation rate); *Coleman v. Estes Express Lines Inc.*, 730 F. Supp. 2d 1141, 1149 (C.D. Cal. 2010) (allowing 100% violation rate assumption where complaint did not "allege a more precise calculation"). However, some courts have rejected the assumption of a 100% violation rate. *Beck v. Saint-Gobain Containers, Inc.*, 2016 WL 4769716, at *11 (C.D. Cal. Sep. 12, 2016) (citing *Vasserman v. Henry May Newhall Memorial Hospital*, 65 F.Supp.3d 932, 972 (C.D. Cal. 2014) (a 100% violation rate cannot be allowed when the defendant had not explained the basis of its assumption that every class member who separated from defendant's employment during the class period should be permitted to recover waiting time penalties for the full period of 30 days)); *see also Ramirez v. HV Global Management Corp.*, 2022 WL 1210402 at *6 (N.D. Cal. Apr. 25, 2022) (finding a 25% violation rate applied to waiting time penalties when Defendants provided little justification for assuming a 100% violation rate, while noting courts have previously issued a 100% assumed violation rate).

Although Plaintiff does not challenge a 100% violation rate here and some courts have assumed a 100% violation rate, the Court notes that Defendants provide little justification for assuming a 100% violation rate here. The Court finds it highly unlikely that each of the 188 former PCMs who separated from employment from Defendants during the relevant period were entitled to around seven hours of pay for thirty days in

penalties. *See also Ramirez*, 2022 WL 1210402 at *6 (finding a 25% violation rate applied to waiting time penalties when Defendants provided little justification for assuming a 100% violation rate, while noting courts have previously issued a 100% assumed violation rate). While the Court will not zero out the claim, the Court will instead assume a 60% violation rate, the same rate that Defendants urged for in other claims and the same rate used when Plaintiff did not oppose the calculation. *See Dart*, 574 U.S. at 82. This results in an amount in controversy of $513,894.24 for this claim.

**i.** **Waiting Time Penalties**: $**151.86**/day x **30** days x **188** former PCMs x **.60** = **$513,894.24**

**g.** **Business Expenses Reimbursements**

Plaintiff further seeks reimbursement of expenses and costs incurred by PCMs in "direct discharge of the duties of their employment, in violation of Labor Code section 2802." Complaint ¶ 73. Defendants assume that each of the PCMs incurred $1.33 per day (a prorated daily rate from $40 per month before taxes and fees during a thirty-day billing cycle) on the days Plaintiff and the PCMs actually worked, resulting in an amount in controversy of $74,084.99. Oppo. at 20. Plaintiff urges the Court to use a $20 per month fee as "[e]mployees are typically at work less than half of their non-sleeping hours" and Defendants have offered no evidence of reimbursements supporting their figure. Motion at 17–18.

As an initial matter, the Court finds neither of the assumptions are unreasonable on their face. Defendants identified at least some factual basis for making their estimation as they account for a significant proportion of the possible non-violations of using a personal cell phone for personal use. As Plaintiff argues, however, Defendants no doubt have access to records of reimbursed business expenses that could have provided at least some factual basis for assumptions about (1) how many employees incurred business expenses, and (2) how much each of those employees should be assumed to have spent. Even a statement in Ms. Williams's declaration attesting to a review of relevant records and some data points underlying this estimate may have been sufficient, but Defendants

provide neither. The Court will not elect to zero-out this claim, as Defendants provide their reasoning in using a pro rata daily rate in reaching their calculation, but will utilize the same 60% violation rate assumption that Defendants have urged for in other claims. This results in an amount in controversy for this claim of $44,562.40 for business expense reimbursements.

> i.   **Business Expense Reimbursements**: ($**40**/month/**30** days) x **.60** x **55,703** PCMs' Recorded Workdays = **$44,562.40**

### h.   Attorneys' Fees

Defendants include attorneys' fees of 25% of the amount in controversy for all underlying claims as part of their calculations, amounting to $1,004,333.76 in their Opposition. Oppo. at 35. In Plaintiff's Motion, Plaintiff urges the Court to decline to include attorneys' fees for meal and rest period claims. Motion at 3. In his Reply, however, Plaintiff urges the Court to entirely decline to include attorneys' fees in the amount in controversy because the "removing party asks to flatly apply an additional 25% in attorneys' fees, without distinct evidentiary support." ECF No. 15 at 10.

The Court will not zero-out Defendants' attorneys' fees calculations for the amount in controversy. While *Jauregui* does not specifically address attorneys' fees, the Ninth Circuit has been clear that attorneys' fees are appropriately included in amount in controversy calculations under CAFA, and the Court thus applies *Jauregui's* admonition against zeroing out claims to this instance. *Fritsch*, 899 F.3d at 794; *contra* Reply at 10 (citing pre-*Jauregui* case law that zeroed out attorneys' fees calculations for amount-in-controversy). The Court also agrees with Defendants' estimate of a 25% attorneys' fee recovery. A 25% fee recovery is the "benchmark" level for reasonable attorneys' fees in class action cases. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998). While Plaintiff notes that there is no "per se" rule that 25% is the appropriate amount of fees, and any eventual attorneys' fees award would be subject to the Court's discretion, the Court finds that the "benchmark" fees recovery is the appropriate estimate in this case.

*Fritsch*, 899 F.3d at 796. Additionally, the Ninth Circuit in *Fritsch* did "not hold that a percentage-based method is never relevant when estimating attorneys' fees included in the amount in controversy, only that a per se rule is inappropriate." *Id.* at n.6.

      Therefore, the Court accepts a 25% fee recovery, and the attorneys' fees calculation is as follows:

      i.   **Attorneys' Fees**: (**$91,197.04 + $131,395.95 + $222,592.99 + $91,884.37 + $311,888.00 + $142,814.00 + $82,706.88 + $569,276.40 + $576,208.40 + $201,650.00 + $513,894.24 + $44,562.40) x 0.25 = $745,017.67**

      The following chart reviews and totals the minimum amounts in controversy the Court adopted for each of Plaintiff's claims under CAFA jurisdiction, as discussed above:

| Plaintiff's Claim | Court's Adopted Amounts in Controversy |
|---|---|
| Sub-Minimum Wage Violations | $91,197.04 |
| OTC Minimum Wage Violations | $131,395.95 |
| Liquidated Damages | $222,592.99 |
| Unpaid Overtime Wages | $91,884.37 |
| Facial Meal Period Violations | $311,888.00 |
| Latent Meal Period Violations | $142,814.00 |
| First Rest Break Violations | $82,706.88 |
| Second Rest Break Violations | $569,276.40 |
| Late Wage Payment Penalties | $576,208.40 |
| Wage Statement Penalties[5] | $201,650.00 |
| Waiting Time Penalties | $513,894.24 |
| Business Expense Reimbursements | $44,562.40 |
| Attorney's Fees (25%) | $745,017.67 |
| **Total** | **$3,725,088.34** |

---

[5] As stated in footnote 5 above, the Court uses the Defendants' late wage payment penalties calculation, which contains the Defendants' previous latent meal break and second rest break violations calculations in calculating the amount in controversy.

Adding together the amounts-in-controversy calculated above produces a total amount in controversy of $3,725,088.34. Defendants have not shown by the preponderance of the evidence that the amount in controversy is $5 million dollars, and accordingly, this Court does not possess subject matter jurisdiction under CAFA over this matter.[6]

## B.    Traditional Diversity Jurisdiction

As an additional matter, the parties dispute whether it is proper for the Court to consider traditional diversity jurisdiction as a basis for removal of this case. In Defendants' Opposition, Defendants argue that removal jurisdiction also exists under traditional diversity jurisdiction because the amount in controversy for Plaintiff's individual claims is greater than $75,000 based on the inclusion of attorneys' fees. Oppo. at 2–3. Defendants concede that they did not "proffer" the amount in controversy for Plaintiff's individual claims in the NOR, and provide no explanation for why they failed to do so. *Id.* at 2. Instead, Defendants argue that "[i]n response to a remand motion, Defendants may proffer evidence establishing traditional diversity jurisdiction not contained in their NOR." *Id.*

Plaintiff contends that the Court cannot consider traditional diversity jurisdiction because it is a new basis and Defendants did not remove on traditional diversity grounds. Reply at 2–3. Plaintiff cites to *Ortiz v. Tara Materials, Inc.*, in which the court found a defendant could not assert a new, entirely different basis for removal from that originally alleged. 2021 WL 5982289, at *3 (S.D. Cal. Dec. 17, 2021). *Ortiz* is distinct from the facts here. In *Ortiz*, the plaintiff sought to amend his notice of removal by adding an allegation that the amount in controversy was satisfied based solely on his individual claim, whereas

---

[6] While the Court considers the calculations contained in Defendants' Opposition through removal, this Court finds it unnecessary to include Defendants' revised calculations post-removal which utilize projections (some of which are based on unreasonable assumptions as previously mentioned). Oppo. at 25. Additionally, even if post-removal fees were included, the Court is unpersuaded that Defendants have adequately established their anticipated fees here.

in his initial notice of removal he alleged the amount was satisfied solely based on the aggregation of his claims with the class members' claims. *Id.* at *1.

Here, Defendants expressly reserved their right to amend the NOR "as to traditional diversity and/or federal question jurisdiction." NOR ¶¶ 7, 65.  The Defendants at least mentioned traditional jurisdiction in their NOR, and as such, the Court will consider whether traditional diversity jurisdiction exists based on the evidence contained in Defendants' Opposition to the instant motion.

Plaintiff did not challenge any of Defendants' specific values regarding traditional diversity jurisdiction in his Reply, but because Defendants applied the same principles and violation rates in calculating the amounts in controversy for traditional diversity jurisdiction as they used in calculating the amounts in controversy under CAFA jurisdiction, the Court will apply the same reasonable violation rate assumptions and formulas presented in the Court's analysis of CAFA jurisdiction. Using these principles, the Court adopts the Defendants' estimates for each claim except the values for latent meal break violations, second rest break violations, waiting time penalties, business expense reimbursements, and attorneys' fees. [7]

    i.     **Latent Meal Break Violation**: (**146** shifts over 5 hours – **68** recorded late/shorts/missed meal break shifts) x **.20** x **$19.27** RROP = **$300.61**

    ii.     **Second Rest Break Violations**: **137** shifts over 6 hours x **.60** x **$19.27** RROP = **$1,583.99**

    iii.     **Waiting Time Penalties**: **$143.4**/day x **30** days x **.60** = **$2,581.80**

    iv.     **Business Expense Reimbursements**: (**$40**/month/**30** days) x **.60** x **160** Recorded Workdays = **$128.00**

---

[7] As stated in footnotes 5 and 6 above, the Court will continue to use the Defendants' higher late wage payment penalties, which contains the Defendants' previous latent meal break and second rest break violations calculations in calculating the amount in controversy.

v.      **Attorneys' Fees**[8]: (**$1,148.07 + $327.60 + $1,475.67 + $255.53 + $1,310.36 + $300.61 + $231.24 + $1,583.99 + $5,803.66 + $2,050.00 + $2,581.20 + $128.00**) x **0.25 = $4,298.98**

The following chart reviews and totals the minimum amounts in controversy the Court adopted for each of Plaintiff's claims under traditional diversity jurisdiction:

| Plaintiff's Claim | Court's Adopted Amounts in Controversy |
|---|---:|
| Sub-Minimum Wage Violations | $1,148.07 |
| OTC Minimum Wage Violations | $327.60 |
| Liquidated Damages | $1,475.67 |
| Unpaid Overtime Wages | $255.53 |
| Facial Meal Period Violations | $1,310.36 |
| Latent Meal Period Violations | $300.61 |
| First Rest Break Violations | $231.24 |
| Second Rest Break Violations | $1,583.99 |
| Late Wage Payment Penalties | $5,803.66 |
| Wage Statement Penalties | $2,050.00 |
| Waiting Time Penalties | $2,581.20 |
| Business Expense Reimbursements | $128.00 |
| Attorney's Fees (25%) | $4,298.98 |
| **Total** | **$21,494.92** |

Thus, in adding together the amounts in controversy incorporating the Court's adopted estimates, to the amounts in controversy for the above claims, the total amount in

---

[8] In their Opposition, Defendants determined that attorneys' fees put $100,000 in controversy for Plaintiff as an individual. While there is no per se rule that 25% is the appropriate amount of fees and any eventual attorneys' fee award is subject to the Courts' discretion, the Court finds that $100,000 (more than four times Defendants' estimated amount in controversy) of estimated attorneys' fees is unreasonable. *See Fritsch*, 899 F.3d at 794. Therefore, in applying the same assumptions as applied to CAFA jurisdiction, the Court finds that the 25% "benchmark" is appropriate for traditional diversity jurisdiction.

controversy is $21,494.92, which is lower than the $75,000.00 traditional diversity jurisdictional minimum.

In sum, the Court does not possess subject matter jurisdiction based in CAFA or traditional diversity jurisdiction in this case.

## IV.   CONCLUSION

For the reasons stated above, the Court **ORDERS**:

1. Defendants' Ex Parte Application Construing Defendants' Opposition to Motion to Remand as an Amendment to the Notice of Removal is **GRANTED IN PART**;

2. Defendants' Ex Parte Application Striking and/or Disregarding Plaintiff's Arguments Raised for the First Time on Reply is **DENIED IN PART**;

3. Defendants' Ex Parte Application Granting Defendants Leave to File a Sur-Reply is **DENIED IN PART AS MOOT**; and

4. Plaintiff's Motion to Remand is **GRANTED**.

The case is therefore **REMANDED** back to San Diego County Superior Court.

**IT IS SO ORDERED.**

Dated:  July 27, 2022

Honorable Linda Lopez
United States District Judge

21cv2100-LL-BLM